UNITED STATES of America, Plaintiff,

v.

PERMA PAVING CO., Inc., and Anthony Rose, Defendants and Third-Party Defendants-Appellees.

UNITED STATES of America, Plaintiff-Appellee,

v.

The CITY OF NEW YORK, Defendant-Appellant and Third-Party Plaintiff-Appellant.

Nos. 367, 368, Dockets 28494, 28495.

United States Court of Appeals Second Circuit.

Argued March 17, 1964.

Decided June 2, 1964.

---

4. This was the substance of Mrs. Spicer's testimony.

Joel L. Cohen, New York City (Leo A. Larkin, Corp. Counsel of The City of New York, Seymour B. Quel, New York City, of counsel), for The City of New York.

Robert E. Kushner, New York City (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, James G. Greilsheimer, Asst. U. S. Atty., of counsel), for the United States of America.

Before FRIENDLY, HAYS and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge:

The United States brought two actions in the District Court for the Southern District of New York to recover costs it had incurred in dredging a portion of the navigable channel of the Bronx Riv-

er. One was against Perma Paving Company, Inc., and Anthony Rose, its president and sole owner, which, under a month-to-month lease, had occupied City-owned property bounded on the east by the Bronx River. Perma's overloading of this riparian land with bricks, granite, and fill was alleged to have caused shoaling in the channel in violation of 33 U.S.C. § 403. The other action, for the same grievance, was against the City, which impleaded Perma and Rose as defendants on a claim for indemnification. After consolidation of the actions and trial, Judge Murphy entered judgment finding that Perma, Rose and the City were jointly and severally liable to the United States and that the City was not entitled to indemnity from Perma and Rose. Damages were later stipulated in the amount of $56,963.16 and a final judgment was entered in that amount. From this the City appeals on the two grounds that the evidence was insufficient to establish wrongful acts on its part, and that the statutes do not entitle the United States to recover money damages for removal of an obstruction of the channel of a navigable stream caused by the misuse of riparian land.

■■ A brief recapitulation of the testimony sufficiently answers the first point. The riparian land in question was in a marginal swamp area with low bearing capacity. The month-to-month lease issued by the City to Perma in October, 1953, and the accompanying permit from the Department of Marine and Aviation authorized Perma to "Fill in land to legal street grade and store fill, brick, granite etc." The legal street grade was a height of 10', but the City, without making any tests as to the bearing capacity of the land, later raised the permissible level of the fill to 20'. Under the lease, Perma covenanted to "comply with all rules, regulations and orders of federal, state and municipal authorities" and not to "fill or store materials to exceed the height as permitted in the permit issued by Marine and Aviation." In addition, the City reserved the right to terminate Perma's occupancy by service of a thirty day no-

tice irrespective of violations. City inspectors came frequently on the land avowedly in an effort to see to it that the fill did not exceed the permitted limit and was not within 20' of the river bank.

In September, 1955, a federal employee found that because of undue shoaling he could no longer dock his boat at the Perma premises; he discovered that at the toe of the fill there was much "flotable material" subject to tidal action, that pilings had moved some distance into the water, and that at the edge of the river the fill was about 30' high for a distance of 500' along the bank. An employee of the Corps of Engineers testified that, shortly after receiving this report, he had found the existence of a large shoal of mud some five or six hundred feet in length along the Perma property extending into the channel and preventing navigation at low tide. This could be called a mud wave or a slide; "The tremendous height of the fill being placed on the marsh would force the mud conditions constituting the marsh out from underneath, pushing it towards where the deep water was."

This and other evidence amply warranted the judge in finding that the City, as well as Perma and Rose, had violated the governing federal statutes we shall now analyze. By the terms of its permits and by its periodic inspections, the City actively controlled the height and position of the fill. If it authorized and participated in uses of its riparian land which violated federal statutes, it cannot escape liability because its land was subject to a tenant's occupancy, which in any event was cancellable on thirty days notice. So we turn to the City's contention that the relevant federal statutes do not authorize the award of money damages for the removal of an obstruction illegally caused.

In response to the holding in Willamette Iron Bridge Co. v. Hatch, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1888) that there was no federal common law prohibiting an obstruction to a navigable stream, Congress moved speedily to pass the Rivers and Harbors Act of 1890, 26

Stat. 426. This was later replaced by the Act of March 3, 1899, 30 Stat. 1121, whose provisions are found in 33 U.S.C. § 401 et seq. Section 10 of the Act of 1899, now 33 U.S.C. § 403, said that "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited" and also that "it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of * * * the channel of any navigable water of the United States," save on prior recommendation of the Chief of Engineers and authorization by the Secretary of the Army. 33 U.S.C. § 406 makes a violation of the above a misdemeanor punishable by a fine of not more than $2,500 nor less than $500, or imprisonment for not exceeding one year, or both. It further provides that "the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States." 33 U.S.C. § 407 makes it unlawful, *inter alia*, "to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water * * * where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed." 33 U.S. C. § 411 makes violation of § 407 a misdemeanor punishable as above provided, and § 413 directs that "The Department of Justice shall conduct the legal proceedings necessary to enforce the provisions" of all the sections we have mentioned.

 United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L. Ed.2d 903 (1960), decided several issues pertinent to this case. It settled that the deposit of solids affecting the navigable capacity of a stream is the creation of an "obstruction" within 33 U.S.C. § 403; plainly there is not one rule when a riparian owner discharges solids from his property into the stream and a different one when he places such excessive weight on the property as to cause the soil itself to move into the bed of the stream. The Republic Steel decision settled also that the Government might obtain relief against such an "obstruction" by injunction ordering its removal, although § 12 of the Act of 1899, now 33 U.S.C. § 406, expressly authorized an injunction only for the removal of "structures" in contrast to the superseded language in § 10 of the Act of 1890 which had provided that "[T]he creating or continuing of any unlawful obstruction in this act mentioned may be prevented and such obstruction may be caused to be removed by the injunction of any circuit court . . .." 26 Stat. 455. The majority of the Court justified this departure from literalism by saying:

"The void which was left by Willamette Iron Bridge Co. v. Hatch, supra, need not be filled by detailed codes which provide for every contingency. Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation." 362 U.S. at 492, 80 S. Ct. at 890.

 Indeed, the City concedes, as we think it must, that, under Republic Steel, the district court could have issued an injunction directing it to remove the shoal, and could have held it in civil contempt for disobedience. But it insists that the United States may not itself perform the work and collect what the City would have had to spend. We see no basis for reading the statutes so narrowly. When the Supreme Court has already made it clear that § 403 impliedly

authorizes the federal courts at the instance of the United States to order such a defendant to dredge out the shoaling he has caused, an application by the government merely to recover the costs it incurred in doing the job for him seems an *a fortiori* case for applying "the doctrine which, in the absence of contrary implications, construes a criminal statute, enacted for the protection of a specified class, as creating a civil right in members of the class, although the only express sanctions are criminal." Reitmeister v. Reitmeister, 162 F.2d 691, 694 (2 Cir. 1947). See also Texas & Pac. Ry. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916); Fitzgerald v. Pan American World Airways, Inc., 229 F.2d 499 (2 Cir. 1956); Dann v. Studebaker-Packard Corp., 288 F.2d 201 (6 Cir. 1961); Borak v. J. I. Case Co., 317 F.2d 838, 847 (7 Cir. 1963), cert. granted, 375 U.S. 901, 84 S.Ct. 195, 11 L.Ed. 143 (1964); Note, Implying Civil Remedies from Federal Regulatory Statutes, 77 Harv.L.Rev. 285 (1963). The remedy of damages is less burdensome to the defendant since it relieves him of having to undertake a task which he may have neither the knowledge nor the skill to perform or supervise. More important, it assures the United States the speedy and competent removal of an obstruction to navigation which may be vital to the avoidance of accidents imperiling life, limb or property, to the interests of commerce, or even to the national defense. We can think of no sensible reason why Congress should have desired that if the executive branch chooses to effect immediate removal of an obstruction, through the services of the Corps of Engineers or otherwise, rather than resort to the slower injunctive process of the courts, the offender should thereby escape his due.

▮ We are not here required to consider whether the statute creates rights on behalf of persons injured by an obstruction to navigation; we are concerned with the rights of the United States, the prime beneficiary of the statute, to recover its removal costs. It seems altogether plain that if Congress had done nothing more than prohibit such obstructions or make them unlawful, the Attorney General could have enforced the statute by any appropriate means, including a suit for recovery of amounts expended by the United States in removing the obstructions, even without a direction to him to enforce the Act such as is contained in 33 U.S.C. § 413. United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888). We see no basis for thinking that the imposition of criminal penalties and the specific authorization of injunctive relief for a particular purpose indicated a Congressional desire to withhold a remedy which in many instances will be more appropriate.

Against this the City relies on United States v. Zubik, 295 F.2d 53 (3 Cir. 1961) and United States v. Bethlehem Steel Corp., 319 F.2d 512 (9 Cir. 1963), cert. denied, 375 U.S. 966, 84 S.Ct. 484, 11 L. Ed.2d 415 (1964), refusing to allow the United States to recover damages for the removal of a wrecked ship which the owner had abandoned. We need not determine whether if that precise issue should arise in this circuit, we would follow those decisions or Judge Browning's dissent in the Bethlehem case. It is enough here that the detailed provisions with respect to wrecked vessels contained in 33 U.S.C. §§ 409, 411, 412, 414 and 415, afford a far stronger basis for immunizing the owners of wrecked vessels from *in personam* liability for the costs of removal than any of the statutes relevant to this case. Indeed, the author of the principal opinion in the Bethlehem case seemingly assumed that the Government could have recovered the costs of dredging the channel on the facts in Republic Steel. 319 F.2d 518.

Affirmed.