UNITED STATES of America,
Plaintiff,

v.

John R. UNDERWOOD et al.,
Defendants.

Civ. No. 70–389.

United States District Court,
M. D. Florida,
Tampa Division.

June 8, 1972.

John L. Briggs, U. S. Atty., by Oscar Blasingame, Asst. U. S. Atty., M.D.Fla., Tampa, Fla., for plaintiff.

Charles F. Clark, of Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for defendants.

## INTERLOCUTORY SUMMARY JUDGMENT

KRENTZMAN, District Judge.

### STATEMENT OF THE CASE

The United States filed a complaint alleging that the defendants, John R. Underwood, W. G. Underwood and R. W. Underwood, Jr., have or caused to have the bottom and shorelines of the Weeki Wachee River excavated and dredged during the years 1967 and 1968 without a permit as required by Title 33, United States Code, Section 403.

The government seeks inter alia, relief in the form of an order compelling the defendants to restore the bed and shoreline of the river to their original condition or in the alternative, damages equal to the cost of such restoration.

The defendants filed an answer. Depositions were taken of the defendants and personnel from the Corps of Engineers.

The government then sought by motion a summary judgment under Rule 56(c), F.R.Civ.P., declaring the defendants liable for the injuries resulting from the unlawful excavation and dredging of the river. Both sides have filed memoranda and affidavits in support of their positions on the motion. The Court has considered the depositions and affidavits. Hearing was held on May 17, 1972, and argument of counsel was heard.

### FACTS WITHOUT SUBSTANTIAL CONTROVERSY

The Weeki Wachee River is located in Hernando County, Florida. The source of the River is at Weeki Wachee Springs adjacent to United States Highway 19. The river runs for approximately 7 miles and empties into the Gulf of Mexico. Historically small personal boats have traveled the length of the river for purposes of fishing and enjoyment of the natural beauty of the river and surrounding area.

On page 39 of the deposition of John R. Underwood, the following was recorded:

"Q. Well, let me stop and ask you a couple of questions about the river. Had you been on the river by boat at a time before the excavation?

A. Yes, sir.

Q. How far up the river had you gone?

A. From one end to the other.

Q. All the way up to their dam.

A. Yes, sir. Way up and beyond their dam.

Q. In other words, you could go through the dam on up to the springs?

A. Yes, sir.

Q. And then, therefore, it was possible to go by boat from the springs to the gulf. Is that correct?

A. Yes, sir."

Also, see the deposition of William G. Underwood, beginning on page 5.

"Q. And like your brothers, you have observed the river for many years?

A. Well, its been quite a few years. I use to when I was younger, go up and down the river, but for the last 15 or 20 years I haven't been on the river much.

Q. Just for information, I am sure as a young fellow you weren't blessed

488

with an outboard motor. Was it possible to maneuver up that river without an outboard?

A. Sir, I never went up it, I always went down it.

Q. You got in and went down?

A. Yes, sir, and then I had somebody take the truck down and pick me up at the other end of it. I have never tried to go up it.

Q. Well, do you know if it were possible to go against the current up stream in the row boat?

A. People have done it. Yes, sir."

The affidavit of Eugene E. Butler states:

"When we moved to the River it was a beautiful, primitive river, deep enough for large boats to navigate with crystal clear, unpolluted water. The river in front of our home was eight to twelve feet deep with a grassy bottom. There was an abundance of otters, alligators, limpkins, bream, shiners, bass and turtles in and around the River."

■ At the source of the river there is a commercial tourist attraction known as Weeki Wachee Springs. The court takes judicial notice that tourism is one of the largest commercial interests and revenue sources for the State of Florida. Tourists travel to Florida from other states and foreign nations for the purpose of enjoying the weather and beauty of Florida. As John R. Underwood states at p. 43 of his deposition, twenty to fifty big boats with hundred horsepower motors travel from the Spring up and down the river every day.

The water level of the river is affected to some extent by the ebb and flow of the tide in the Gulf of Mexico.

■ The Court takes judicial notice that Weeki Wachee River connects with the Gulf of Mexico and thereby forms a public highway thereto.

From the pleadings and depositions it appears undisputed that the defendants acquired a parcel of land on the northside of the river in the 1950's. The defendants planned and developed this property and divided the area into small lots to be sold as weekend sites and known as Weeki Wachee Retreats.

The defendants contracted with Charles Sasser for the removal of material from the bed and shorelines of the river adjacent to Weeki Wachee River. The plan was that the elevation of the Underwood property would be raised to equal that of the approximate elevation of the developments downstream. The excavation was performed with the knowledge and supervision of one or more of the defendants.

The excavation was accomplished by a dragline sitting on the edge of the river and removing material from the bed of the river and the shoreline. The material consisted of grass and dirt. This was placed on the shore.

In addition to the alteration of the river, a series of canals were dug. The canals were connected to the river and access to the river was provided by Big Cypress Canal.

The defendants admit that they never had the recommendation of the Chief of Engineers nor the authority of the Secretary of the Army as required by Title 33, United States Code, Section 403. Application was made for an "after the fact" permit. The permit was denied.

The government contends that the acts alleged in the complaint lowered the water level of the river and thereby interfered with navigation. The government further alleges that the operations destroyed vegetation and injured the ecology and hydrology of the river and adjacent areas.

The affidavit of William F. Newhall, Professor of Biochemistry at the University of Florida, states that after he observed a dragline operating at Weeki Wachee Retreats and after the canals were opened into the river the level of the water dropped about 28" in a few days.

Dr. Newhall further states:

"Since the water level fell, the wildlife in the area adjacent to the River has almost completely vanished. A sandbar

formed in front of my property, which fills the entire River and obstructs boat traffic. The River was formerly about eight feet deep in this area."

In his affidavit, Mann G. Davis, III, a hydraulic engineer with the Corps of Engineers, states in part:

"It is my opinion that the excavation in the vicinity of 'Weeki Wachee Retreats' lowered water levels upstream substantially enough to upset stable river conditions to the extent that erosive velocities were created for a distance approximately two miles upstream. These erosive velocities have caused a scour and shoal condition which has altered the channel prism. It is also my opinion that the causative factor was the removal of a natural control which had existed in the area of the excavation."

## LEGAL BACKGROUND

### I.

### NAVIGABLE WATERS OF THE UNITED STATES

The power of the federal government over navigable waters stems from the commerce clause of the United States Constitution, Article I, Section 8. Historically federal legislation and regulation, and the jurisdiction of the federal courts, has been concerned with matters of admiralty, navigation and water as a source of electric power.

The regulation in the present case is the Rivers and Harbors Act of 1899, Title 33, United States Code, Section 401 et seq. Under this Act, the Corps of Engineers has been delegated certain duties and authority to regulate and permit operations in navigable waters.

Thus:

It is clear that it is necessary to obtain a permit from the Corps of Engineers under existing law and regulations before submerged land may lawfully be filled, excavated, channeled and other similar activities performed thereon such as contemplated here, if the area is navigable, or if the proposed work would affect nearby navigable waters. Tatum v. Blackstock, 319 F.2d 397 (5th Cir. 1963)

With the growing public interest in protecting our natural resources, Congress passed the Fish and Wildlife Coordination Act of 1958, Title 16, United States Code, Section 661 et seq. and the National Environmental Policy Act of 1969, Title 42, United States Code, Section 4331 et seq. The Fifth Circuit Court of Appeals then added new scope to the authority of the Corps of Engineers under the Rivers and Harbors Act and said as to permits:

"The establishment was entitled, if not required, to consider ecological factors and, being persuaded by them, to deny that which might have been granted routinely five, ten, or fifteen years ago . . . " Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), cert. den. 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed. 2d 808.

With the commerce clause as its source, the river of judicial interpretation has followed a winding course from the mouth of which has emerged a flood of tests for determining the navigability of bodies of water. Many of the criteria do not appear to be sufficient alone but may be useful when combined with others.

The basic test of navigability is that stated in The Daniel Ball, 77 U.S. 557, 10 Wall. 557, 563, 19 L.Ed. 999 (1870):

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or in uniting with other waters, a continued highway over which commerce is or may be carried

on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

A.

## THE LOG AND SMALL BOAT TESTS

 In many states a stream down which a single log will float may be described as navigable. 56 Am.Jur., Waters, Sec. 188. To make a stream navigable under federal law the floating of logs must be related to interstate commerce. Logging operations alone have frequently not been held sufficient to make a stream navigable for federal purposes. Northern New Hampshire Lumber Co. v. New Hampshire Water Resources Board, 56 F.Supp. 177 (D.C.N.H. 1944); Willow River Power Co. v. United States, 101 Ct.Cls. 222, rev. 324 U.S 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1944).

Where the size of the operation places it within the scope of interstate commerce the use for logging can be enough for federal purposes. Under such conditions, the Seventh Circuit has ruled rivers navigable solely because of earlier commercial logging use and said:

The East Branch of the Chippewa River never was utilized for ordinary boat traffic. The claim that it is navigable water under the federal test is based upon its use in log drives from 1876 to 1924 . . .

In St. Anthony Falls Water-Power Company v. St. Paul Water Commissioners, 168 U.S. 349, 18 S.Ct. 157, 42 L.Ed. 497, it was held that the upper reaches of the Mississippi River were navigable at all points, although it had been established that only logs were able to traverse certain sections of the river. . .

We think the Commission under the authorities cited is correct in holding that the East Branch of the Chippewa River is navigable. State of Wisconsin v. Federal Power Commission, 214 F.2d 334 (7th Cir. 1954).

Where small boats have travelled the stream along with logs, the streams have generally been held navigable. Wisconsin Public Service Corp. v. Federal Power Commission, 147 F.2d 743 (7th Cir. 1945), cert. den. 325 U.S. 880, 65 S.Ct. 1574, 89 L.Ed. 1996.

As to boat travel, in The Montello, 87 U.S. 430, 20 Wall. 430, 441, 22 L.Ed. 391 (1874) the Court said:

"It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. *If it be capable in its natural state of being used for purposes of commerce,* no matter in what mode the commerce may be conducted, *it is navigable in fact,* and becomes in law a public river or highway." (Emphasis added.)

And in United States v. Appalacian Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940) the court said at p. 416, 61 S.Ct. at p. 303:

"In addition to the testimony of use in the days before railways and good roads, there was a demonstration of the possibility of navigation by a government survey boat with an outboard motor, 16 feet long, five feet wide, drawing 2½ to 3 feet, loaded with a crew of five and its survey equipment. This boat made a round trip from the Narrows, just above Wiley's Falls, to Allisonia, a distance of 72 miles one way, in July, 1936, when the river stage was normal summer low water. While the crew was out of boat and used poles a number of times, there were no carries or portages. Going upstream it was not necessary to pull or push the boat more than a mile and a quarter and not more than a few hundred feet on the return trip.

\* \* \* \* \* \*

Nor is lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the

stream for the simpler types of commercial navigation."

## B.

### THE EBB AND FLOW OF THE TIDE

■ In the 1825 case of the Steamboat Thomas Jefferson, 23 U.S. 428, 10 Wheat. 428, 6 L.Ed. 358, the Supreme Court held that the admiralty jurisdiction extended no further than the ebb and flow of the tide in accordance with the English Common Law. However, in 1851, the court reconsidered the admiralty jurisdiction in the light of the use of the steamboat in commerce. The court found that the test for admiralty jurisdiction should be one of navigability and commerce.

"The jurisdiction is here made to depend upon the navigable character of the water, and not upon the ebb and flow of the tide. If the water was navigable it was deemed to be public; and if public, was regarded as within the legitimate scope of the admiralty jurisdiction conferred by the Constitution.

"It so happened that no seizure was made and no case calling for the exercise of admiralty power arose for a long period of time, upon any navigable water where the tide did not ebb and flow. As we have before stated, there were no navigable waters in the United States upon which commerce in the usual acceptation of the word was carried on, except tide water, until the valley of the Mississippi was settled and cultivated, and steamboats invented, and no case therefore came before the court during the early period of the government that required it to determine whether this jurisdiction could be extended above tide." The Genessee Chief v. Fitzbugh, 53 U.S. 443, 12 How. 443, 13 L.Ed. 1058.

In cases involving regulation of the use and construction in navigable waters the courts have generally held that the federal power is not limited to areas within the ebb and flow of the tide. And in the Steamer Daniel Ball v. United States, 77 U.S. 557, 10 Wall. 557, 19 L.Ed. 999 (1870) the court said the ebb and flow of the tide do not constitute "any test at all of the navigability of waters". p. 563.

In Pitship Duck Club v. The Town of Sequim, 315 F.Supp. 309 (D.W.D.Wash. 1970) the court denied federal navigability as to a lagoon used for duck hunting and cited *The Daniel Ball*, supra, for the rule that ebb and flow is not a federal test of navigability.

The tide has never fully gone out on the ebb and flow theory, however. Where a body of water is clearly navigable, the courts have on occasion, extended the jurisdiction of the Corps of Engineers under the Rivers and Harbors Act of 1899 to those areas adjacent to the navigable water which are affected by the ebb and flow of the tide from such water. Tatum v. Blackstock, 319 F.2d 397 (5th Cir. 1963); United States v. Baker, 2 E.R.C. 1849 (S.D.N.Y.1971).

## C.

### ACCESS TO THE OPEN SEA

Like the ebb and flow of the tide, the necessity of access to the open sea is not a requirement to establish navigability under the Commerce clause.

It seems to us that the requirement of an outlet to the sea may be eliminated as unnecessary to federal jurisdiction under the commerce power for the same reasons [as the ebb and flow of the tide]. . . . Davis v. United States, 185 F.2d 938 (9th Cir. 1950) cert. den. 340 U.S. 932, 71 S.Ct. 495, 95 L.Ed. 673.

Access to the sea either directly or through other bodies of water continues to influence the decision of the courts. Where a body of water supported small commercial traffic but no nexus with interstate or foreign commerce nor access to a larger body of water was shown, a district court held the water was not navigable. Johnson v. Wurthman, 227 F.Supp. 135 (D.C.Or.1964). Similarly, Shogry v. Lewis, 225 F.Supp. 741 (W.D. Pa.1964).

Obstructions which prevent access to commerce but which can be removed by reasonable exercise of public authority do not prevent a body of water from being navigable. United States v. Appalacian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940).

Access to the open sea is thus not essential to navigability but continues to play an important role in the decisions of the courts.

## D.

### SUBSTANTIAL EFFECT ON INTERSTATE COMMERCE

█ Congress may regulate activity which though entirely local exerts a substantial effect on interstate commerce. Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

Federal regulation has been extended to commercial institutions whose operations are directed to and depend to a great extent upon interstate travelers. Heart of Atlanta Motel Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

Thus the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce, p. 258, 85 S.Ct. p. 358.

The court cited Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 6 L.Ed. 23 (1824) wherein the power of the federal government to regulate navigable waters was derived from the Commerce clause.

Where commerce is interstate or foreign, it is not necessary that such commerce be conducted upon the entire length of a navigable body of water. United States v. Appalacian Power Co., supra; or that such commerce extend into the open sea, Davis v. United States, supra. Therefore, where interstate travelers enter at the source of a river and travel in boats down such river, it is not necessary that they travel the full length of such river in order to be in interstate commerce. Indeed, where a commercial tourist operation depends upon a body of water as its attraction to interstate travelers, injury to the body of water may injure interstate commerce.

## E.

### REASONABLE IMPROVEMENT

█ A waterway which can be made available for navigation in commerce by reasonable improvement is a navigable water of the United States if there is a balance between the cost and the need for such improvement.

"To appraise the evidence of navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. 'Natural and ordinary conditions' refers to volume of water, the gradients and the regularity of the flow. A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken. . . . These limits are necessarily a matter of degree. There must be a balance between cost and need at a time when the improvement would be useful." United States v. Appalacian Power Co., supra, at 407, 61 S.Ct. 291, 299, 85 L.Ed. 243.

## F.

### MISCELLANEOUS FACTORS

Other factors have a bearing on the final decision as to whether a waterway is subject to regulation by the federal government. These influences are not necessarily characteristics of the particular body of water. They may be economic, ecological or evidentiary matters which, when coupled with the physical nature of the waterway, influence a court's decision.

Some of these factors are:

Flood control and water resources, Oklahoma v. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1940);

the protection of wildlife and natural resources, Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970); cert. den. 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808; and the opinions of regulating agencies such as the Corps of Engineers, Tatum v. Blackstock, 319 F.2d 397 (5th Cir. 1963).

## II.

## THE UNITED STATES IS ENTITLED AND THIS COURT HAS THE POWER TO GRANT APPROPRIATE RELIEF FOR INJURY RESULTING TO NAVIGABLE WATERS

Section 403 of Title 33, United States Code, makes it unlawful:

". . . to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

Section 406 provides:

"Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States."

The United States Supreme Court has held that the criminal penalties provided in Section 406 do not exclude the district courts from granting appropriate civil remedies. Wyandotte Transportation Company v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); United States v. Republic Steel Corporation, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

In *Wyandotte* and *Republic Steel* the Court held that the principal beneficiary of the Rivers and Harbors Act of 1899 is the federal sovereign. The United States is the principal beneficiary by virtue of Article I, Section 8, of the Constitution which grants the power to Congress to regulate interstate and foreign commerce. Out of this power arises a duty of the federal government to prevent obstruction to navigation in interstate commerce. *Wyandotte, supra*, page 201, 88 S.Ct. 379, 19 L.Ed.2d 407.

This power extends to the protection of wildlife in navigable waters, as well as to the protection of navigation. Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970) cert. den. 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808; United States v. Baker (D.C.S.D.N.Y. July 29, 1971) 2 E.R.C. 1849.

As a principal beneficiary of the Act the federal government is entitled to seek appropriate relief in the courts.

In Wyandotte Transportation Company v. United States, *supra*, at pages 201 and 202, 88 S.Ct. at page 386, the Court said:

"Our decisions have established, too, the general rule that the United States may sue to protect its interests. Cotton v. United States, 11 How. 229, 13 L.Ed. 675 (1851); United States v. San Jacinto Tin Co., 125 U.S. 273, 88 S.Ct. 850, 31 L.Ed. 747 (1888); Sanitary District of Chicago v. United States, *supra*. This rule is not necessarily inapplicable when the par-

ticular governmental interest sought to be protected is expressed in a statute carrying criminal penalties for its violation. United States v. Republic Steel Corp., *supra*. Our decisions in cases involving civil actions of private parties based on the violation of a penal statute so indicate. Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). In those cases we concluded that criminal liability was inadequate to ensure the full effectiveness of the statute which Congress had intended. Because the interest of the plaintiffs in those cases fell within the class that the statute was intended to protect, and because the harm that had occurred was of the type that the statute was intended to forestall, we held that civil actions were proper. That conclusion was in accordance with a general rule of the law of torts. See Restatement (Second) of Torts § 286. We see no reason to distinguish the Government, and to deprive the United States of the benefit of that rule.

The inadequacy of the criminal penalties explicitly provided by § 16 of the Rivers and Harbors Act is beyond dispute. That section contains only meager monetary penalties. In many cases, as here, the combination of these fines and the Government's *in rem* rights would not serve to reimburse the United States for removal expenses. It is true that § 16 also provides for prison terms, but this punishment is hardly a satisfactory remedy for the pecuniary injury which the negligent shipowner may inflict upon the sovereign. Cf. United States v. Acme Process Equipment Co., 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966)."

■ The relief to which the government is entitled is the "remedy that ensures the full effectiveness of the Act", *Wyandotte*, 389 U.S. at p. 204, 88 S.Ct. at p. 387. That relief includes injunction for removal of obstructions and restora-

tion of the area surrounding a navigable water to its original condition. United States v. Baker, *supra*, and United States v. Joseph G. Moretti, Inc., 331 F.Supp. 151 (D.C.S.D.Fla.1971).

In construing Section 406, the Honorable William O. Merhtens held:

"Although Section 406 authorizes the removal of 'structures' created in violation of Section 403, the language in Section 403 of Title 33, United States Code, specifically the use of the word 'obstruction' is broad enough to justify the removal of any obstruction *or any diminution of the navigable capacity of a waterway*. Consequently, a district court has authority under the Rivers and Harbors Act of 1899 to order the navigable capacity of a waterway restored. United States v. Joseph G. Moretti, Inc., supra, p. 158."

The power of the district court to grant injunctive relief is far greater in situations where the public interest is involved. Virginian Railway Company v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); United States v. First National Bank, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1964). The public interest in protection of the navigability and the ecological aspects of the waters of the United States is clearly spelled out in the National Environmental Policy Act of 1969, Title 42, United States Code, sec. 4331 et seq. and the Fish and Wildlife Coordination Act of 1958, Title 16, United States Code, sec. 661 et seq. Zabel v. Tabb, supra.

■ Where the party causing the injury to navigable waters refuses to remedy the situation or for some other reason the United States is compelled to perform the remedy, the government is entitled to the equivalent cost in damages. *Wyandotte*, supra; United States v. Perma Paving Co., 332 F.2d 754 (2nd Cir. 1964).

■ It is not necessary that the government prove that it lacks an adequate remedy at law where injunctive relief is sought in this type of case. In Shafer

v. United States, 229 F.2d 124 (5th Cir. 1956), the Court said:

"It is contended that the Government has not shown irreparable injury and that it has an adequate remedy at law . . . . The United States, however, is not bound to conform with the requirements of private litigation when it seeks the aid of the courts to give effect to the policy of Congress as manifested in a statute. It is a familiar doctrine that an injunction is an appropriate means for the enforcement of ʻan Act of Congress when it is in the public interest."

## III.

### SUMMARY JUDGMENT IS PROPER FOR CERTAIN PORTIONS OF THIS CASE

Rule 56(a), Federal Rules of Civil Procedure, provides that summary judgment may be awarded "upon all or any part" of a claim.

Subsection (d) provides for an "order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy and directing such further proceedings in the action as are just." . .

Subsection (c) provides:

"A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

The purpose of a summary judgment on less than all matters pending in a cause is to "save time and expense and greatly simplify the trial by making the order specified in Rule 56(d)." 3 Barron and Holtzoff, Federal Practice and Procedure, Wright Ed., Section 1241.

 Summary judgment is applicable to a claim for injunctive relief as in any other action. United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

The defendants in this cause have supplied the affidavit of Dr. B. A. Christensen, Professor of Civil Engineering at the University of Florida. It is his opinion, based upon his analysis of the Weeki Wachee River, that "restoration" is not indicated and that any artificial interference with the natural processes in the adjustment of the river would be done issue of what, if anything, should be at the hazard of creating more detrimental than beneficial effects. Ultimately, the Court must weigh the factual done.

The determination of the availability of relief is nevertheless a part of the issue of "the amount of damages" under Rule 56(c). Indeed damages available may be from zero to infinity depending upon the needs of the occasion. This is particularly true where equitable relief is sought and the action to be taken may not be capable of measure in monetary terms.

As one district court said:

By granting summary judgment declaring that liability has been admitted and leaving the remedies by way of injunction, accounting and the like to be determined later, we merely crystallize and reduce the issues. The finding of liability will abide the final determination of the relief to be granted after full trial, when the matters decided will be merged in one final judgment from which an appeal will lie. Harris, Inc. v. Tops Music Enterprises, Inc., 160 F.Supp. 77 (S.D. Cal.1958).

In United States v. Moretti, *supra*, the court placed burden on the defendants to restore an area of navigable water to its original condition. If the outcome of the appeal in *Moretti* is favorable to the government, it may well be that a proper order in the present case would be to compel the defendants to submit further proof of the lack of feasible restoration rather than compelling the government to come forth with solutions. Such a determination is reserved for a later date.

After hearing and verbal findings thereat, at the request of the court Oscar Blasingame, Esquire, Assistant United States Attorney, prepared and submitted this partial summary judgment which has been only slightly modified by the Court. For his service the Court expresses appreciation to Mr. Blasingame.

## FINDINGS OF FACT

The following material facts are found to be without substantial controversy and deemed established:

 1. By reason of its length, depth and natural beauty and its access to the Gulf of Mexico, and beyond the Weeki Wachee River is capable in its natural state and by reasonable improvement of use by small vessels traveling in interstate and foreign commerce and its condition has an effect on interstate and foreign commerce. The river is navigable in fact.

2. The defendants, John R. Underwood, W. G. Underwood and R. W. Underwood, Jr. caused to be excavated a portion of the Weeki Wachee River without the recommendation of the Chief of Engineers and the authority of the Secretary of the Army as required by Title 33, United States Code, Section 403, resulting in injury to the navigability and the ecology of the river.

3. The kind and amount of relief and damages is in good faith controverted and a trial on such issues shall be conducted accordingly.

## CONCLUSIONS OF LAW

1. By virtue of the findings of fact that the Weeki Wachee River is navigable in fact under the federal test, it is a navigable water of the United States within the scope of Title 33, United States Code, Section 403.

2. The defendants by their unlawful acts of excavating the Weeki Wachee River became liable to the United States of America for a remedy appropriate to its injury.

3. Summary judgment as to the navigable nature of the Weeki Wachee River and as to liability of the defendants is available under Rule 56(c) and (d) and will greatly facilitate the speedy and efficient administration of justice in this cause.