**UNITED STATES of America, Plaintiff,**

v.

**Clifton CANNON et al., Defendants.**
**Civ. A. No. 4454.**

United States District Court,
D. Delaware.

Sept. 21, 1973.

---

Bruce L. Thall, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Robert W. Tunnell, of Tunnell & Raysor, Georgetown, Del., for defendants.

## MEMORANDUM OPINION

STAPLETON, District Judge:

The government here seeks to enjoin a "development project" of defendants that is alleged to violate the Rivers and Harbors Act of 1899. The case is presently before the Court on cross-motions for summary judgment and on defendants' "motion to dismiss." Jurisdiction is sound. 28 U.S.C. § 1345.

Mr. and Mrs. Clifton Cannon are the owners of a 179 acre tract located adjacent to the southern portion of Little Assawoman Bay, Sussex County, Delaware. A portion of this tract appears on a 1972 quadrangle map prepared by the U.S. Geological Survey as a thin peninsula extending from a point of land called Drum Point northward into Little Assawoman Bay and terminating at a point called "Point of Ridge." The map shows a dirt road on the peninsula extending approximately 9/10ths of the way to Point of Ridge. Some 500 feet north of Point of Ridge is an island, "Point of Cedars Island," which is apparently not owned by the Cannons.

The complaint in this action alleged that the Cannons, with the assistance of the third defendant, a contractor, were engaged in a "development project." According to the government, this "project consists of the filling of the tidal marsh between Drum Point and Point of Cedars, the filling of additional tidal marsh adjacent thereto, and the filling of subaqueous land between Point of Ridge and Point of Cedars so that a continuous land mass is created." In addition, the complaint charged that "dredging, filling, bulkheading and other activities" were then being conducted on this site. Allegedly these activities violated Sections 10 and 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq., since no permit had been issued by the Secretary of the Army or the Army Corps of Engineers authorizing them.[1] The complaint sought temporary and permanent injunctive orders barring further work on the project and requiring restoration of the "tidal wetlands" to a condition "as near as possible" to the previous natural state.

Shortly after the commencement of the action, a temporary restraining order was entered without opposition from the defendants. On February 9, 1973 the defendants served requests for ad-

---

1. Section 10 of the Act, 33 U.S.C. § 403, provides in part as follows:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build . . . any . . . bulkhead . . . or other structures in any . . . navigable river, or other water of the United States . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill or in any manner to alter or modify the course, location, condition or capacity . . . of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

Section 13 of the Act, 33 U.S.C. § 407, provides in part:

It shall not be lawful to . . . deposit, or cause . . . to be . . . deposited . . . from the shore, . . . any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause . . . to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: . . . provided . . . that the Secretary of the Army, whenever in the judgment of the Chief Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters . . . provided application is made to him prior to depositing such material.

missions of fact. Among other things, this document asked for an admission that "the filling which did occur in marsh areas of this project has always been in a marsh area above the ordinary high water mark." The government filed a denial of the requested admission on March 21, 1973, ten days beyond the thirty day period provided by Rule 36.

## I. THE GOVERNMENT'S VERSION OF THE FACTS.

The government has submitted a number of affidavits of state and federal employees who viewed the premises on several inspection trips. These affidavits tend to indicate that on May 12, 1972 dump trucks and a front end loader were dumping gravel on the property and spreading it in such a way as to make a road "along the narrow point of land towards a small island at the northerly end the point of land referred to" as Point of Ridge. "This activity was taking place in the area between the small island and the mainland with water on all sides of the road being constructed, except the side that was attached to the mainland." According to these affidavits, by May 24, 1972 the road had been extended to the small island. In August of 1972 dump trucks were observed dumping "fill . . . onto the marshland."

Gerald Taylor, a biologist employed by the Bureau of Sport Fisheries and Wildlife, states that there was no road going across the tidal marsh area involved in this suit in 1968. Mr. Taylor further states that:

> Although dirt may have been dumped by defendants on a hill above the mean high water mark, dirt was in the main deposited in tidal marsh, much of which was below mean high water. I know this because of characteristic vegetation growing on the marsh in which dirt was dumped.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> It is your affiant's opinion that extensive destruction of these valuable tidal marshes is the result of numerous dredging, filling, and bulkheading operations, like Point of Ridge which, if taken together, result in considerable adverse impact upon the environment. In addition, each such operation causes considerable destruction both of the entire marsh area in which the project is developed and the surrounding and adjacent marsh area. Unless such projects are stopped soon, tidal marshes will be irretrievably lost. . . .

According to the government, the Corps of Engineers sent a registered letter to Mr. Cannon on June 2, 1972 notifying him that the activity being conducted on the site in question was in violation of the Rivers and Harbors Act because he did not have a permit to fill the tidal marshland. On August 9, 1972 a permit application was received from Mr. Cannon. Due to its lack of detail the Corps wrote in response that more specific information would be needed before a decision on the application could be made. Accompanying the permit application was an appendix containing a rough sketch of the peninsula and notations indicating an intention to bulkhead the perimeter thereof. This appendix contained notations, "Proposed bulkhead 700LF in Little Assawoman Bay," and "Proposed bulkhead at high water line." The application is presently pending.

## II. THE DEFENDANTS' VERSION OF THE FACTS.

An affidavit of Mrs. Cannon filed by the defendants reviews the history of the property and recounts its use by her father and grandfather for agricultural purposes. Mrs. Cannon speaks of two different dumping activities on the property. Dirt hauled in by dump truck was placed "in piles on a hill which is several feet above the high water mark." "Approximately twelve percent (12%) of the dirt was spread on lower ground. This lower ground was not flooded by the normal tide. It would occasionally be flooded by a storm."

Mrs. Cannon also speaks of the defendants having "dumped dirt into the

water for a distance of approximately twenty feet (20′) where the road, which had been used all . . . [of her] life had washed away." This washing had produced a situation where "the water came in upon the road on each tide for a depth of about three inches (3″) deep." This area was filled "in order to preserve . . . [the] road and to preserve . . . [the Cannon's] access" to the land comprising the tip of Point of Ridge. Mrs. Cannon denied that any fill had been placed between Point of Ridge and Point of Cedars Island.

The defendants take the position, and the government apparently concedes, that there has thus far been no excavation and no bulkheading in the area in question.

### III. THE EFFECT OF THE GOVERNMENT'S UNTIMELY RESPONSE TO REQUESTS FOR ADMISSIONS.

Under Rule 36(a) a "matter is admitted unless, within 30 days after service of the request, . . . the party to whom the request is directed serves" a written answer or objection upon the requesting party. Under Rule 36(b) "any matter admitted . . . is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Under this rule, the Court may permit withdrawal or amendment "when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits."

The government here maintains that the Court should treat its late response as an amendment to the admissions made by operation of law upon the expiration of the thirty day period. The Court is satisfied that the presentation of the merits of this action will be subserved by treating the government's tardy response as an amendment and by thereby relieving the government of the previous admission by default. The Court is also satisfied that this course of action will not prejudice the defendants. Accordingly, the responses stated in the government's March 21, 1973 filing will hereafter be considered as the government's response to defendants' requests for admissions.

The defendants' "motion to dismiss" is based upon the argument that the federal government has no "regulatory jurisdiction" over the area described in the complaint. This argument is predicated on the assumption that the government must be held to its admission that the defendants' activities were limited to areas above the mean high water mark. Since the government has been relieved of this "admission by law," defendants' "motion to dismiss" must be denied.

### IV. THE EXTENT OF REGULATION UNDER THE RIVERS AND HARBORS ACT.

The parties agree that Little Assawoman Bay is navigable in fact and, accordingly, is in law a "navigable water" of the United States as that term is used in the Rivers and Harbors Act. Even so, they disagree as to the territorial limits of federal regulation under that act.

The government maintains that "jurisdiction" under the Act clearly extends to the mean high water mark of a navigable body of water. It goes further, however, and asserts that this jurisdiction extends to all portions of a "tidal marsh" adjacent to navigable water, including those portions which are not inundated at mean high tide.[2] Finally, the government says that jurisdiction under the Act extends to any area beyond the limits of navigable water where activities like filling, excavating

---

2. The government apparently takes the position that marshes adjacent to a navigable body of water are part of that body of water if their grasses are affected, nourished or influenced by the tide, even though not covered at mean high tide.

and bulkheading would "affect areas which are considered to be navigable waters."

The defendants, on the other hand, maintain that regulation under the Act clearly does not extend beyond mean high tide. They go further, however, and insist that even those marsh areas which are covered by waters of a navigable bay at mean high tide are not navigable waters of the United States unless they are navigable in fact.

To pose the relevant issue as one of the territorial scope of federal regulatory jurisdiction under the Rivers and Harbors Act serves to confuse rather than to enlighten. Casting the question in this form merges three distinct inquiries which must be made under the applicable case law: (1) is a particular body of water within the phrase "navigable waters of the United States" as used in the Act, (2) if so, how far does that body of water extend, and (3) what acts or activities with respect to such navigable waters are prohibited by the Act.

■ As this Court noted in United States v. Pot-Nets, Inc. et al., 363 F. Supp. 812 (D.Del.1973), a body of water is navigable water of the United States "if (1) it is presently being used or is suitable for use, or (2) it has been used or was suitable for use in the *past*, or (3) it could be made suitable for use in the future by reasonable improvements for transportation and commerce." Under this standard there can be, and there is no dispute that the body of water

called Little Assawoman Bay comes within the scope of the phrase navigable waters of the United States.

■ It is equally clear under the cases that this body of water extends in law to its mean high water mark and that it does not extend to areas above that mark which are occasionally inundated by waters of the Bay. Indeed, as this Court noted in the *Pot-Nets* case, the most recent regulations of the Corps of Engineers declare that its jurisdiction "extends to the line on shore reached by the plane of mean (average) high water" and that "marshlands and similar areas are . . . considered 'navigable in law' . . . only so far as the area is subject to inundation by the mean high waters." 37 Fed.Reg. No. 176, Part 209.260(k)(2). This interpretive regulation has sound basis in existing case law.[3]

Just as the applicable rules of law foreclose the government's attempt in this case to extend navigable waters landward of the mean high water mark, they also foreclose the defendants' attempt to restrict such waters below that mark. No inquiry is required here as to whether a particular area covered at mean high tide by the waters of the Bay holds the potential of commerce.[4]

Finally, the government contends that its regulatory jurisdiction extends to any area adjacent to navigable water where filling or excavating activity may "affect" such waters. This proposition is troubling if it is intended, as it apparently is, to include an assertion that

---

3. United States v. Chicago, Milwaukee, St. Paul and Pacific R. R. Co., 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950). Plaintiff's reliance on dictum found in United States v. Lewis, 355 F.Supp. 1132 (S.D.Ga.1973) that a marsh adjacent to a navigable stream is itself deemed to be navigable is misplaced. That case involved an area that was entirely covered by water by the mean high tide. Moreover, the *Lewis* court cited approvingly the above regulation. Nor does United States v. Joseph G. Moretti, Inc., 331 F.Supp. 151 (S.D.Fla.1971) cit-

ed by plaintiff support a contrary proposition. In *Moretti* the defendant was engaged in dredging subaqueous land in Florida Bay. There was there no question but that this activity was below the mean high water mark.

4. See *e. g.*, United States v. Turner, 175 F. 2d 644 (5th Cir. 1949). We are not presented with a situation where two distinct bodies of water are connected and one must decide whether the smaller is to be evaluated as an independent body or as an extension of the larger one. *Compare* Toledo Liberal Shooting Co. v. Erie Shooting Club, 90 F. 680 (6th Cir. 1898).

the licensing requirement of the Rivers and Harbors Act encompasses any activity on fast land which, while involving no direct physical intrusion upon navigable waters and no indirect creation of an impediment or obstruction to navigation, may nevertheless affect the ecology of the adjacent body of water.[5] The question, of course, is not whether Congress has the constitutional power under the commerce clause to subject such activity to regulation; the question is whether it has done so. The answer accordingly lies in the Act itself and in an analysis of the particular activities which are there declared to be subject to regulation.

■ It is clear that Sections 403 and 407 do reach activities on fast land the effect of which is "the creation of . . . [an] obstruction . . . to the navigable capacity of any [water] of the United States." 33 U.S.C. § 403.[6] Moreover, we can accept as correct those cases which hold that where a permit is required the government may take environmental considerations into account in deciding whether to issue a permit.[7] It does not necessarily follow, however, that an ecological impact on navigable water without more is enough to require a permit under the Rivers and Harbors Act.[8]

I do not, however, think it appropriate to pass upon this question at the summary judgment stage and with the limited record now before the Court. As indicated below, a trial will be required in this case and resolution of this question may ultimately not be required. Moreover, I have found no case in which the question has been addressed and I am persuaded that judgment in this virgin field is better reserved until after the trial.[9]

## V. SUMMARY JUDGMENT.

■ Insofar as this case involves charges of illegal excavating and bulkheading and charges of illegal filling other than in connection with the alleged restoration of the road, there is a material dispute of fact which precludes summary judgment for either side. With respect to the charges of excavating, of bulkheading, and of filling the subaqueous land between Point of Ridge and Point of Cedars Island, the defendants deny that there has been any such activity. While the permit application may indicate that defendants do wish to bulkhead, the current record is as consistent with their refraining from doing so until a permit is issued, as it is with their attempting to proceed without one. With respect to the charge of dumping

---

5. The government's affidavits seem to suggest, for example, that destruction of marsh grass above the mean high water mark is a hazard to the ecological balance in the bay and perhaps to water fowl in the area.

6. See e. g., United States v. Underwood, 344 F.Supp. 486 (M.D.Fla.1972); United States v. Perma Paving Co., 332 F.2d 754 (2nd Cir. 1964).

7. E. g., Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970) cert. denied 401 U.S. 910, 91 S. Ct. 873, 27 L.Ed.2d 808 (1971).

8. Query, for example, whether filling which destroyed marsh grass above the mean high water mark would come within the scope of Section 403 as creating an "obstruction . . . to the navigable capacity of any [water] of the United States," or as filling "in any manner to alter or modify the . . . condition . . . of the

channel of any navigable water of the United States."

9. We consider it the part of good judicial administration to withhold decision of the ultimate questions involved in this case until this or another record shall present a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts. While we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide. Kennedy v. Silas Mason Co., 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948). See John Blair & Co. v. Walton, 47 F.R.D. 196, 197 (D.Del.1969); United States v. Small, 24 F.R.D. 429 (S.D.N.Y.1959); 6 Moore, Federal Practice, ¶ 56.15 [6].

on a "tidal marsh" in August of 1972, the crucial question under the applicable law, as in the *Pot-Nets* case, appears to be the location of the mean high water mark. Mrs. Cannon's affidavit would indicate that the dumping and spreading was done in an area which was not inundated at mean high water. The government's affidavits tend to indicate the contrary. Summary judgment is thus inappropriate.

The government contends, however, that Mrs. Cannon has confessed to a violation of Sections 403 and 407 with respect to the construction or reconstruction of the road and that where a portion of "a project" has been found by the courts to be below mean high water, the entire "project" has been enjoined.

While I agree with the government that the road matter may not simply be disregarded as *de minimis*, summary judgment does not seem appropriate even if Mrs. Cannon's affidavit is taken as a confession of a breach of duty. Assuming injunctive relief is appropriate with respect to all of an integrated project where a portion thereof is in violation of the Act,[10] the record in this case does not establish any connection between the work on the road and the other activity complained of. Moreover, even if the government's request for relief at this summary judgment stage were limited to the road area, a further hearing would seem appropriate with respect to the precise form that such relief should take.[11] Accordingly, even if Mrs. Cannon's affidavit were construed as the government suggests, severing this portion of the

case at this stage would not serve to substantially conserve judicial resources.

Finally, however, it is not altogether clear that Mrs. Cannon's affidavit is an admission of a violation. Regulation 209.260(1) of the Corps of Engineers provides in part:

(1) *Geographic limits: Shifting boundaries.* Permanent changes of the shoreline configuration result in similar alterations of the boundaries of the navigable water. Thus, gradual changes which are due to natural causes and are perceptible only over some period of time constitute changes in the bed of a water body which also change the shoreline boundaries of the navigable waters. However, an area will remain "navigable in law," even though no longer covered with water, whenever the change has occurred suddenly, or was caused by artificial forces intended to produce that change. . . .

It is possible to draw the inference from this regulation that where there is a sudden washout, from a storm for example, the mean high water mark remains unchanged and a riparian owner may take remedial action in an area theretofore above the mean high water mark without securing a permit. I do not so hold at this time, however. The parties have not briefed the point and the record does not indicate the precise history of the road area where the filling was done.[12] Here also I reserve decision until after trial on the merits and the development of a full record.[13]

The cross motions for summary judgment will be denied.

Submit order.

---

10. The cases relied upon by the government in this regard do not compel this conclusion. See *e. g.*, United States v. Perma Paving Co., 332 F.2d 754 (2nd Cir. 1964); United States v. Joseph G. Moretti, Inc., 331 F. Supp. 151 (S.D.Fla.1971); United States v. Baker, 2 E.R.C. 1849 (S.D.N.Y.1971).

11. *See* United States v. Underwood, 344 F. Supp. 486 (M.D.Fla.1972); United States v. Lewis, 5 E.R.C. 1198 (S.D.Ga.1973).

12. The affidavit of Mrs. Cannon does state that the area subject to tidal flooding upon which the defendants placed fill was formerly used as a road by them and that, inferentially, it was formerly above mean high tide. It does not state what caused the road to become subject to tidal flooding.

13. See note page 13, *supra*.