UNITED STATES of America, Plaintiff,

v.

COMMODORE CLUB, INC., et al., Defendants.

Crim. No. 5–80037.

United States District Court, E. D. Michigan, S. D.

April 27, 1976.

Harold Z. Gurewitz, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Raymond A. Ballard, Detroit, Mich., for defendants.

## OPINION OF THE COURT

PHILIP PRATT, District Judge.

### I.

### PROCEDURAL BACKGROUND

This case was brought as a criminal prosecution against the named corporate and individual defendants on an indictment charging them with violating § 403 of the Rivers and Harbors Act of 1899,[1] which is punishable as a misdemeanor under § 406 of that Act. Section 403 states, in part:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any waters of. the United States is prohibited; . . . and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any . . . haven, harbor, canal, lake . . . or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

On stipulation by the parties this case was tried to the Court without a jury. At the close of the Government's case the defense moved for a verdict of acquittal as to Mr. Jack Clark, Vice President of Commodore Club, on the ground that the Government had not established a prima facie case against that defendant. After oral argument and consideration of the evidence adduced by the Government the Court granted the defense motion as to Mr. Clark. It denied a similar motion as to Mr. Gilmore and the defense proceeded with their case. Oral argument was heard at a later date after close of the proofs.

As a criminal prosecution it was the Government's burden to prove the three elements of a § 403 violation beyond a reasonable doubt. The three elements here are (1) that defendants caused a fill to occur (2) in navigable waters of the United States (3) without prior authorization (by permit) by the Army Corps of Engineers. The Government maintains that the evidence proves all three elements beyond a reasonable doubt. The defense argues that the Government failed to meet its burden of proof as to the second and third elements. Additionally there is present the issue of whether intent or scienter is also an element that must be proved. The following are the findings of this Court.

### II.

### THE PROPERTY IN QUESTION

The criminal charge is based on certain fill and reclamation activities conducted on property, owned by the defendant corporation, which is located adjacent to Lake St. Clair in Harrison Township, Macomb County, Michigan.[2] The property is adjacent to and southeasterly of Selfridge Air Force Base. It comprises approximately 66 acres.

It would appear that the general area in question prior to the earliest recorded time was marshland, kept wet by periodic overflows from Lake St. Clair, but not subject to extensive flooding during normal high waters.[3] The earliest recorded use of the property dates from 1910, when the owner of the entire area (which now encompasses the land in question and the Blue Lagoon Marina property), a Mr. Schweikart, dredged ditches around the periphery, with an outlet into Lake St. Clair and converted the marshland into a carp farm.[4] The ditches were apparently used to maintain a controlled minimal level of water on the

1. 33 U.S.C. § 403.

2. *See* Exhibit A attached hereto.

3. Other adjacent areas, including parts of what is now Venice Shores, were "swampy" but the general practice in many such areas was to pump out the water and use the property as farmland. Testimony of Ralph E. Beaufait, a life-long resident and former Township Clerk of Harrison Township.

4. Testimony of Ralph E. Beaufait.

property to carry on the carp business. Aerial photographs taken in 1935, 1938 and 1940 [5] disclose a definitive tree-lined bank on the lake side of the north ditch with no breaks except where the ditch inlet was dug. It would thus appear that for most of the first half of this century this inundated parcel was separated from Lake St. Clair and not part of that lake.[6]

The land was apparently unused for several decades, having changed ownership in the 1940's. In 1954 initial inquiries were made as to the feasibility of building a marina in this area. Studies and investigations continued until 1960 when the Conger Bay Development Company began to build Blue Lagoon Marina in the easterly portion of the old Schweikart property.

The westerly portion, now in dispute, remained unimproved. Comparison of aerial photographs taken in 1961 [7] and 1964 [8] indicate that the lake was beginning to take its toll on the separating ridge of land.[9] The ridge of trees still existed but was noticeably thinned out from erosive attrition. High waters in the late 1950's had apparently breached the ridge as revealed in the 1961 photograph but these waters had either receded or the land had been built up so that it was again a continuous stretch of land, dividing the 66 acres [10] from the lake.

Jack Clark testified that in 1968 during negotiations for the purchase of the Blue Lagoon properties he and the former owner drove back and forth over the sand bar (all that was left of the ridge of trees) inspecting the property, and that at that time the bar still divided the 66 acres from the lake. He also testified that he was subsequently required to remove fallen trees in the area and had heavy machinery in the area for that purpose.

Only after the historic flooding of 1973 and 1974 did the barrier finally give way. Although there apparently had been periodic flooding from Lake St. Clair (and for that matter the Great Lakes generally) several times this century, the flooding, which began in 1972, reached its peak in 1973 and continued at high levels through 1974, broke all previous records.[11] Venice Shores and many other areas along the western side of Lake St. Clair had flooded-out streets and homes. The Army Corps was set to work for months building protective dikes to protect property.

The flooding drastically altered the character of the Commodore Club property (the 66 acres). The high waters of the lake decimated the sand bar ridge and with that barrier removed, those acres were inundated with the flood waters, as were other

5. Defendants' Exhibits W, X and Y, respectively.

6. The testimony of Mogens C. Nielsen of the Michigan Department of Natural Resources was particularly illuminating and impressive as to this finding. As a result of the passage of the Submerged Lands Act, No. 247, Public Acts of 1955, as amended, M.C.L.A. § 322.701 et seq., Mr. Nielsen conducted effective and searching inquiry into the lakeshores of the State of Michigan and was able to produce aerial photographs, maps and other documentary evidence which had significant probative value.

7. Defendants' Exhibit J.

8. Defendants' Exhibit O.

9. No photographs of the area from 1940 to 1960 were introduced. However, Mr. Mogens C. Nielsen, now Chief of the Submerged Lands Management Division of the Michigan Department of Natural Resources testified that while employed with D.N.R. he first inspected this property in 1958 and 1959, examined the shoreline and determined that the parcel should be considered "upland."

10. Some time prior to 1960 the Government had purchased an 11-acre rectangular parcel of the Schweikart property across the north-south drainage ditch from Selfridge Air Field. When Blue Lagoon was built one condition imposed by the township was that the owners expand the east-west ditch and dredge a new north-south canal to the lake, for residents of the new Venice Shores development. As the Government owned the portions of the drainage ditch adjacent to the 11-acre parcel (to the west and south) the owners of Blue Lagoon had to dig a new north-south canal to the east of the 11-acre parcel. Thus the undeveloped 66 acres became divided into the 11-acre parcel and the 55-acre parcel (so designated hereafter).

11. Defendants' Exhibit HH.

adjacent properties. Such was the condition of the land when the defendants filed their permit application in 1973.[12]

## III.

### THE PERMIT APPLICATION

Mr. Gilmore purchased the Blue Lagoon Marina and the adjoining 55-acre tract in 1970. The 11-acre tract was purchased in 1972.[13] Originally it was Jack Clark's idea, as President of Blue Lagoon Sales, Inc., to expand the marina east onto the 55-acre tract. However, it was subsequently decided that a new corporation, Commodore Club Apartments, Inc., would be organized to construct residential units on the 66 acres. The plan called for dredging of new canals and a channel into Lake St. Clair, closing of the existing north-south canal, filling and the creation of a man-made lagoon on the property. Thereafter the defendants decided a permit from the Army Corps of Engineers was required and an application was submitted by Professional Engineering Associates on behalf of Commodore Club Apartments, Inc. for a permit to implement their plan, on February 15, 1973.[14]

On March 15, 1973, as required by the applicable federal regulations,[15] the Corps promulgated and distributed a public notice[16] regarding the proposed project. That notice gave all interested parties 30 days to voice any objections or comments in writing to the proposed project.

Yet on April 12, 1973 the Corps sent Mr. Gilmore two draft permits for Gilmore's signature and return.[17] This was three days before the expiry of the comment period stated on the notice.

The cover letter accompanying the draft permit warns the applicant that "if the inclosed permits are not signed and returned within 30 days, this application will be suspended."[18] It was the testimony of Mr. Ottenbaker, then Chief of the Permit Section, that these draft permits were never returned to the Corps. Yet Mr. Gilmore also testified quite adamantly, that he signed the permits upon receipt and returned them (after making a copy of the permit for his records).[19] Considering the importance of the permit to completion of the project the Court accepts the defendant's assertion that he did sign and mail the permits back to the Corps.[20]

According to Mr. Gilmore after he sent the permits back nothing happened for 30 days, so he telephoned the Corps' office in Detroit. He was told that they had not received the permit and had no authority to send him a duplicate. It would appear that the Corps took no further action on processing his permit for several weeks. In June it requested additional information for the Fish and Wildlife Service which was provided.

Mr. Gilmore continued making preparations throughout the summer and fall of 1973, e. g., obtaining a permit for the work

12. Plaintiff's Exhibit 4.

13. Testimony of Mr. Gilmore.

14. Plaintiff's Exhibit 4.

15. 33 C.F.R. § 209.120(f)(1) (1972). The 1972 regulations remained in effect until May 10, 1973, when the Department of the Army published proposed regulations which superceded those in 33 C.F.R. § 209.120 and served as interim guidance to all Corps installations. Those proposed regulations became final and took effect as final regulations on April 3, 1974. Federal Register, Vol. 39, No. 65, p. 12115 (April 3, 1974). The applicable sections of the proposed regulations were not modified and are currently as stated in 33 C.F.R. § 209.120 (1975).

16. Plaintiff's Exhibit 6.

17. Plaintiff's Exhibit 11.

18. Id.

19. Defendant's Exhibit Q.

20. A draft permit signed and dated October 5, 1973 by Mr. Gilmore was introduced with plaintiff's Exhibit 11. It is unclear when and under what circumstances this permit was signed. Defendant's Exhibit Q, the xeroxed copy retained by Mr. Gilmore appears to be a xerox of an original, while the copy dated October 5, 1973 is a carbon copy. The signed carbon copy was retained by the Corps after October 5, 1973.

from the Michigan Department of Natural Resources on September 25, 1973 [21] and from local authorities.

In January, 1974, nine months after the public notice was issued, the Fish and Wildlife Services responded to the notice by letter to the Corps.[22] In the letter the Service stated that the proposed project area was a valuable "environmental area," that the fill would result in a loss of waterfowl nesting and fish spawning areas and recommended that the permit should be denied. The Corps forwarded a copy of that letter to Mr. Gilmore, and requested that he (1) contact the Department of the Interior to resolve the problem and (2) provide an environmental impact statement for the area.[23] Negotiations continued through the spring and correspondence reveals that as of June, 1974 the Fish and Wildlife Service was willing to consider a revised plan.[24] Shortly thereafter a Corps investigation uncovered fill activity at the site and the Corps issued a stop order on all project activity.[25]

## IV.

### THE FILLS

Land fills of three areas are in question in this case: (1) a fill in the 55-acre area (2) a fill in the 11-acre rectangular tract and (3) a fill in the east-west ditch south of the 11-acre tract. The Government relied on these fills to prove its case. Neither party denied that these areas were filled. Moreover, the defendants admitted responsibility for the latter two fills. They also admitted that they were responsible for some of the fill of the 55-acre tract although there was also uncontroverted testimony that unau-

thorized truckers had dumped land fill material in that area.

The timing of these fills, however, can only be approximated. They clearly occurred over a period of several months. The Court can only determine with certainty that the 55-acre fill was completed by September 5, 1974,[26] that the southern canal was breached and filled shortly before July 1, 1974 [27] and there were continued filling activities in the 11-acre tract between October and December, 1974 [28] in the southern half of that tract.

## V.

### DEFENSE OF ESTOPPEL

■ The defendants argue that the Corps is estopped from proceeding against them because it issued a "de facto" permit to them. By "de facto" they refer to the April 12 draft permits which were sent to Mr. Gilmore. While the defendants raise this equitable defense they cite no authority under which it constitutes an affirmative defense to a criminal violation of the Rivers and Harbors Act.

If this were brought as an equitable action by the Corps for injunctive relief, this defense would necessarily deserve considerable attention. Under the interim regulations which became effective May 10, 1973,[29] (and presumably even under the vague standards of the prior regulations) sending an applicant the draft permit for his signature and return is a "final decision" on the merits of the proposed project [30] which should only be made *after* filing of notice,[31] receipt of comments from the affected agencies [32] after a suitable re-

21. Defendant's Exhibit BB.

22. Plaintiff's Exhibit 14.

23. Plaintiff's Exhibit 15.

24. Plaintiff's Exhibit 20.

25. Plaintiff's Exhibit 31.

26. Plaintiff's Exhibits 32, 38.

27. Plaintiff's Exhibits 23, 24.

28. Plaintiff's Exhibit 38 and testimony of Walter Bruno.

29. Federal Register, Vol. 39, No. 65, p. 12115 (April 3, 1974).

30. 33 C.F.R. § 209.120(i)(1)(vii).

31. 33 C.F.R. § 209.120(i)(1)(ii).

32. 33 C.F.R. § 209.120(i)(1)(iii).

sponse time up to 75 days,[33] and a determination of "whether or not [sic] an environmental impact statement is necessary;"[34] only then "[a]fter all above actions have been completed [will the] District Engineer . . . determine in accordance with the record and applicable regulations whether or not the permit will be issued"[35] (i. e., make a "final decision").

It is clear from the exhibits and testimony that these procedures were *not* followed by the Corps as required. At least one example of their failure to follow their own regulations is found in the Corps' letter of June 12, 1973.[36] In that letter it is stated that "in response to our public notice the Federal Fish and Wildlife Services requested additional information relative to your proposed application on behalf of Commodore Club." The Fish and Wildlife Act of 1956[37] requires the Corps to consult with the Fish and Wildlife Service *prior* to issuing a permit where wildlife resources might be affected. Yet it was two months *prior* to that June 12 letter that the Corps issued the draft permits.

Although there was testimony to the contrary, it would appear from the plain language of the regulations that the signature act of the District Engineer is purely ministerial. It states in part:

"If the *final decision* is to issue the permit, the issuing official will forward two copies of the draft to the applicant for signature accepting the conditions of the permit."[38] (Emphasis added).

Clearly if the agency's decision is a *final* one, no further considerations are required. The execution by signing is thus a formality, a necessary one, perhaps, but still a formality.[39]

Yet in this instance all of the prerequisites to a final decision—consideration of

comments, receipt of an EIS, completion of comment period—all occurred after the draft permits had been sent to Mr. Gilmore.

Thus a "clean hands" defense to an injunctive action might have considerable merit. (Indeed the numerous failures of the Corps to adhere to its own regulations supply a good rationale for any attempt at "self-help" by the defendants.) But this is not an equitable action; rather it is a criminal one. And under the Rivers and Harbors Act one has committed a misdemeanor if he fills navigable waters without a "valid permit," which the regulations construe as one signed by the Secretary of the Army or his nominee. No permit here was so signed and the Government, therefore, did prove this element of the offense.

## VI.

## JURISDICTION OF THE CORPS OVER THE FILLS

The defendants next challenge the jurisdiction of the Corps over the areas that were filled. Specifically, they contend that the area in question was fast land not within the scope of the Corps' regulatory power over "navigable waters." At a minimum, they argue, the Government has not proven "beyond a reasonable doubt" that this area *was* part of "navigable waters."

## A.

■ The Government initially contends that the filled areas are within the jurisdiction of the Corps because the defendants in submitting their permit application submitted to the Corps jurisdiction over all of the land encompassed by the proposed project. The Court rejects this proposition as an unfounded and overreaching generali-

33. 33 C.F.R. § 209.120(i)(3)(ii).

34. 33 C.F.R. § 209.120(i)(1)(iv). The Court notes that no environmental impact statement (EIS) was made on this project before the sending of the draft permit.

35. 33 C.F.R. § 209.120(i)(1)(vi).

36. Plaintiff's Exhibit 12.

37. 16 U.S.C. §§ 742a–742j.

38. 33 C.F.R. § 209.120(i)(1)(vii) (1975).

39. Even Mr. Ottenbaker on cross-examination admitted that normally if the permit is signed and returned, the Corps will execute it as a matter of course.

zation. Simply because a person submits a permit application for a proposed project does not mean that *all* proposed activities connected with that project are within the Corps permit jurisdiction. The litigation at bar is a good case in point. The defendants' project included land fill, channeling, dredging and bulkhead construction activities. The canal dredging, channeling and bulkhead activities clearly required a permit; however, that does not necessarily lead to the conclusion that the land fill activities were within the Corps regulatory scope. An applicant will necessarily disclose his entire proposed plan in his permit application but the Corps cannot reasonably construe from that a subjugation to Corps regulation over any or all project actions.

The Court therefore believes that at least in a criminal prosecution such as the one presently before the Court, the prosecution must affirmatively show beyond a reasonable doubt that the area filled was part of a "navigable water" within the meaning of the statute.

### B.

In its attempt to meet that burden the Government introduced testimony and exhibits to show that the area filled was (1) submerged and (2) had a bottom elevation below the ordinary high water mark (OHWM).[40] The Government adduced testimony that for Lake St. Clair the OHWM was 575.7 feet elevation above mean sea level at Father Point, Quebec.[41]

■ With respect to the 55-acre tract the Government proved that a survey crew was sent to the Commodore Club area on October 7 and 11, 1974, and that the submerged areas had a bottom elevation under 575.7.[42]

However, that survey was conducted at least several weeks after the last fill operations in the 55-acre tract were terminated. The survey by necessity could not indicate after the fact what the bottom elevation of the filled area was. Although the bottom contour is essentially flat and in a civil context one might presume the filled area to have previously been that low, this Court will not entertain such a presumption in a criminal prosecution. The Government was required to prove beyond a reasonable doubt that the filled area had previously been under 571.7 feet in elevation and this it failed to do.

■ With respect to the east-west "canal" south of the 11-acre tract the evidence disclosed that this was originally part of the old Schweikart irrigation ditch around the carp farm. No testimony or evidence was introduced to show that it was widened or deepened into a true canal. There was conflicting testimony as to the ability of any boat to navigate through it. While a canal connected to other navigable waters may also be deemed navigable, a trough which is little more than an irrigation ditch is not. The Court is not convinced beyond a reasonable doubt that that section of the old ditch had been improved into a true canal and accordingly that fill also fails to prove the Government's case.

The fill in the 11-acre tract, however, presents a different problem. While the most southerly part of the fill was made prior to the October survey and presents proof problems similar to those in the 55-acre fill, the northerly portion of the fill was completed *after* the survey and the survey clearly shows that the bottom was lower than the ordinary high water mark.

---

**40.** 33 C.F.R. § 209.260 (1975) defines the Corps' jurisdiction to "extend laterally to the entire water surface and bed of a navigable water body, which includes all land and waters below the ordinary high water mark."

**41.** However, the Government was totally unable to explain how it arrived at this figure except to say that "historically" it used this figure, which is four feet higher than the Low Water Datum (LWD) of 571.7 feet.

**42.** Plaintiff's Exhibit 46. The defendants challenged the accuracy of these results, citing possible fluctuations and variances of LWD readings on which the results are based. However, the Court finds that the survey was taken by the most reliable means known and accepts these figures as valid allowing possible variance of six inches either higher or lower.

The defendants' affirmative defense to this fill was that it had been verbally authorized by Corps employees. Conflicting testimony was presented in this regard. Mr. Clark testified that Mr. Barno and Mr. Kimball of the Corps' office had indicated "that they were not concerned with the 11-acre area" when they inspected the site in July, 1974, and that based on those oral assurances he allowed the filling activity on the 11-acre tract to continue until he was ordered to stop by Mr. Gilmore. Mr. Barno denied that he had said the Corps was "not concerned" with that tract.

The Court finds that whatever words were spoken, Mr. Clark believed in good faith that he could proceed with the 11-acre fill. The Court must, therefore, address the question whether the Government must prove defendants' intent to commit a criminal offense under the Rivers and Harbors Act.

## VII.

### THE "SCIENTER" REQUIREMENT

It is the Government's position that § 403 is a *malum prohibitum* statute and does not require proof of scienter or intent. The defendants on the other hand assert that specific intent must be proven.

The Court is not persuaded by the analysis in *U.S. v. Interlake Steel Corporation,* 297 F.Supp. 912 (N.D.Ill.1969) which is cited by the Government. In that case the district court, on a motion to dismiss, held that since Section 13[43] of the Rivers and Harbors Act is a *malum prohibitum* statute carrying no explicit reference to a scienter requirement, it is not an element of an offense under that provision. While such an analysis has some appeal, it ignores the proscription on similar interpretations of statutory offenses declared in *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

In *Morissette,* the Supreme Court reversed the decision of lower courts which had dispensed with the element of criminal intent under 18 U.S.C. § 641. In so holding, the Court, through Justice Jackson, thoroughly discussed the relationship between the element of criminal intent and statutory offenses. It pointed out that:

"The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."[44]

The Court continued:

"Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil. As the states codified the common law of crimes, even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation."

The Court in *Morissette* went on to distinguish between codified common law crimes (which it interpreted 18 U.S.C. § 641 to be) and newly defined statutory offenses enacted as "health and welfare" measures,[45] holding that the former do require proof of scienter even if the latter may not necessarily require it.

However, this distinction between common law codifications and new statutory "public welfare offenses" while compelling is not necessarily conclusive. The Court in *Morissette* suggested that courts should:

"more explicitly . . . relate abandonment of the ingredient of intent, not merely with considerations of expediency

---

**43.** 33 U.S.C. § 407, which prohibits the dumping of refuse or waste materials into navigable waters.

**44.** 342 U.S. at 250, 72 S.Ct. at 243.

**45.** See *U.S. v. Behrman,* 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 and *U.S. v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604.

in obtaining convictions, nor with the *malum prohibitum* classification of the crime, *but with the peculiar nature and quality of the offense.*"[46] (Emphasis added).

Thus, the Supreme Court, in making the distinction, emphasized that:

"Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static."[47]

■ This Court does not believe that the lack of explicit words of scienter from § 403 compels the deduction that no scienter element is required. If an offense carries a requirement of *specific intent,* proper words of scienter must be found in the statute; however, scienter may be that of *general intent* and it is common for codified common law and statutory offenses requiring general intent to omit reference to that element. Therefore this Court believes that in accordance with *Morissette, supra,* it must examine the nature and *quality* of the act to see if a general intent requirement is justified.

An inquiry into the legislative history of the Rivers and Harbors Act of 1899 would be unavailing, but the case law certainly reflects a trend of expanding federal jurisdiction under the Act. Early prosecutions under the Act were generally restricted to true obstructions to navigation and there were few challenges to the Corps' jurisdiction over waters which were clearly navigable.

But over the years the courts have expanded the concepts of "creating obstructions to navigable capacity" and of "modifications[48] . . . to the condition or ca-

pacity" of navigable waters. For example, in a recent and radical foray, the Fifth Circuit has held that activities which occur shoreward of and above the mean high tide line may be within the prohibitions of the Rivers and Harbors Act. *U.S. v. Sexton Cove Estates,* 526 F.2d 1293 (5th Cir. 1976). See also *U.S. v. Perma Paving Co.,* 332 F.2d 754 (2d Cir. 1964). The Court of Appeals in *Sexton Cove, supra,* stated:

"There is no suggestion (in § 403) that an obstruction whose source is above MHTL escapes prosecution. . . . It prohibits the alteration or modification of the course, condition, location or capacity of a navigable water. There is not the slightest intimation that an alteration or modification whose source is above MHTL is any less an alteration or modification."[49]

See also *Weiszmann v. U.S. Corps of Engineers,* 526 F.2d 1302 (5th Cir. 1976); *U.S. v. Moretti,* 526 F.2d 1306 (5th Cir. 1976).

The ultimate impact of these cases (assuming for the moment that they are accepted as a correct position of the law) is that activities by owners on what is clearly fast land could be brought within the Corps' jurisdiction and could constitute the basis of a criminal prosecution resulting in fines of up to $2,500 and one year imprisonment. Yet the *activity* may have occurred on what no one, including the defendant, would deem to be "navigable water."

■ Considering the relatively stringent criminal penalties imposed, the serious consequences of a criminal conviction, the vagaries of the scope of the Corps' jurisdiction under the Act and the fact that effective remedies can be achieved through injunctive action against offending parties, this Court believes that general intent to violate the Act must be established as a prerequisite to criminal conviction under § 403 and § 406 of the Rivers and Harbors Act.

---

**46.** 342 U.S. at 259, 72 S.Ct. at 248.

**47.** 342 U.S. at 260, 72 S.Ct. at 248.

**48.** The Court notes that under *Zabel v. Tabb,* 430 F.2d 199 (5th Cir. 1970), *cert. denied* 401

U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971) a "modification" may be a change in environmental as well as navigable conditions.

**49.** 526 F.2d at 1298.

■ In this case the evidence of even a general intent to violate the Act by filling the 11-acre tract was equivocal at best. The Government did not prove that element beyond a reasonable doubt and thus failed to establish their case against the defendants.

The history of the 11-acre parcel, known as it was by defendants, is a factor in the issue of intent, although it also has significance in the following discussion regarding "fast land." As has been mentioned, the 11-acre parcel was owned by the United States, and it was sold by the General Services Administration to defendants' predecessor in title shortly before the events in issue here. The Government's offering for bids described it as suitable for building purposes, including industrial use and described it as including a "roadway" easement from North Shore Drive to the parcel. The Government sale was for approximately $55,000 and defendants purchased it for approximately $155,000—substantial amounts for land that the plaintiff now claims was an extension of Lake St. Clair. At any rate, it cannot be gainsaid that defendants were illogical or unjustified in believing that the Corps did not claim jurisdiction over the parcel.

## VIII.

### THE LAND–WATER DICHOTOMY

■ Although the Court believes that sufficient reasons are given above to require dismissal of these charges, consideration should be given to the defendants' contention that the area in question must be treated as land rather than as the natural extension of the navigable waters of Lake St. Clair and therefore the Corps has no jurisdiction over the areas filled. The issue, in the context of a criminal prosecution, is more properly phrased as follows: has the Government proven beyond a reasonable doubt that the area in question *was* part of Lake St. Clair and therefore "navigable" under the statute, and not merely temporarily inundated "fast land?"

The pertinent findings of fact on this issue, recited above, can be summarized as follows:

1. Topographically the area including the 55-acre and 11-acre tracts has always been designated as "land."
2. From 1910 to at least 1970 there existed a distinct barrier of land which separated these tracts from Lake St. Clair.
3. This barrier was finally washed away and the tract totally inundated by the record flooding of Lake St. Clair occurring during 1973 and 1974.

The Government's reliance on the fact that in 1973 and 1974 these lands were covered with waters from Lake St. Clair is too simplistic for the Court to accept unhesitatingly. The Government argues that once the waters of a navigable lake extend over an area, if that area is below the ordinary high water mark, then the Corps can assert jurisdiction. If this were generally so, then many low lying areas in Harrison Township which were flooded in 1973–1974 would now be subject to the Corps' dictates. That which was normally and historically land would now be "navigable water" by regulatory fiat.

The question of the legal effect of changes on land by natural forces was considered in *Philadelphia Company v. Stimson,* 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912) and in that case the Supreme Court laid down certain guiding principles. The Court there stated:

"It is the established rule that a riparian proprietor of land bounded by a stream, the banks of which are changed by the gradual and imperceptible process of accretion or erosion, continues to hold to the stream as his boundary; if his land is increased he is not accountable for the gain, and if it is diminished he has no recourse for the loss. But where a stream suddenly and perceptibly abandons its old channel, the title is not affected and the boundary remains at the former line." [50]

50. 233 U.S. at 624, 32 S.Ct. at 346.

This has been the classic test: if erosion or accretion, the boundary changes; but if the natural forces result in avulsion, the boundary remains as before.

The Supreme Court in *Stimson, supra,* affirmed the rule formulated in *County of St. Clair v. Lovingston,* 90 U.S. (23 Wall) 46, 50, 66–69, 23 L.Ed. 59 (1874), that:

> "The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on."

Although these cases dealt with the effects of nature on rivers and streams, there is no reason why riparian rights of lakefront owners should not be treated similarly. That no case involving lakeshore rights was cited only suggests that these natural forces do not normally affect lake riparian property.

But the floods of 1973–1974 were not normal. The waters continued to rise and inundated the lands breaking all recorded lake levels. Large quantities of soil were washed into the Lake; the Corps itself worked overtime constructing dikes and earthenworks to protect property owners.

Unlike other owners, Commodore Club did not take action to protect its ridge of land which had separated the 66 acres from the lake, and as a consequence it was washed away into the lake and the acreage was flooded. Certainly some erosion had occurred prior to 1970, but the separating ridge still existed then. It took the storms and flooding of a two-year historical cycle to wash the barrier ridge away. Erosion or avulsion?

Because this is a criminal prosecution this Court does not have to conclusively find one condition or the other. For if avulsion, then the parties should be allowed to reclaim what once was land and not a lateral extension of Lake St. Clair. It was the prosecution's burden to prove beyond a reasonable doubt that, solely because of erosion, this area *was* part of Lake St. Clair. This Court does have a reasonable doubt, for the possibility that this was an avulsive force cannot be totally discounted.[51]

The foregoing findings cannot be completed without the caveat that the case is presented to the Court in the criminal context. It is not redundant, then, to emphasize that its findings are necessarily grounded on the standard of proof which attaches to criminal cases, that of "beyond a reasonable doubt." It is the failure of the Government to carry its burden in respect to the essential elements of the offense charged in this indictment, concerning this land, that is the fatal flaw.

For those reasons given above this Court does find the defendants Commodore Club Apartments, Inc. and William Gilmore, President, not guilty of a violation of § 403 of the Rivers and Harbors Act. The charges are hereby dismissed.

IT IS SO ORDERED.

EXHIBIT A to follow

---

51.  33 C.F.R. 209.3601 reads in part:

> "(1) *Geographic limits: Shifting boundaries.* Permanent changes of the shoreline configuration result in similar alterations of the boundaries of the navigable water. Thus, gradual changes which are due to natural causes and are perceptible only over some periods of time constitute changes in the bed of a water body which also change the shoreline. *However,* an area will remain 'navigable in law,' even though no longer covered with water, whenever the change has occurred suddenly, or was caused by artificial forces intended to produce that change."

This Court *does* infer from this policy statement "that where there is a sudden washout, from a storm for example, the mean high water mark remains unchanged and a riparian owner may take remedial action in an area theretofore above the mean high water mark without securing a permit." *See U.S. v. Cannon,* 363 F.Supp. 1045, 1052 (D.Del.1973).